**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **KEN DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:12-CV-00056-KOB** |
| | ) | |
| **MICHAEL ASTRUE,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On February 5, 2009, the claimant, Ken Davis, applied for disability insurance benefits

under Title II of the Social Security Act. The claimant alleges disability commencing on March

1, 2008 because of back, leg, and foot pain. The Commissioner denied the claim both initially

and on reconsideration. The claimant filed a timely request for a hearing before an

Administrative Law Judge, and the ALJ held a hearing on January 6, 2011. (R. 20, 24). In a

decision dated March 1, 2011, the ALJ found that the claimant was not disabled as defined by the

Social Security Act and, thus, was ineligible for disability insurance benefits. (R. 29). On

November 15, 2011, the Appeals Council denied the claimant's request for review; consequently,

the ALJ's decision became the final decision of the Commissioner of the Social Security

Administration. (R. 1-4). The claimant has exhausted his administrative remedies, and this court

has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below,

this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the following issues for review: 1) whether the ALJ properly applied the Eleventh Circuit's three-part pain standard; and 2) whether the ALJ erred in rejecting the treating physician Dr. Davis' opinion.

## III.  STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

 "No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to

> engage in any substantial gainful activity by reason of any medically determinable
> physical or mental impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period of not less than 12
> months...

To make this determination, the Commissioner employs a five step, sequential evaluation

process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *See* 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider

whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective

medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2)

that the objectively determined medical condition is of such a severity that it can reasonably be

expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)

(emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R.

§ 404.1529. When the objective medical evidence does not confirm the severity of the alleged

pain, the question becomes whether the underlying medical condition could reasonably be

3

expected to give rise to the alleged pain. *Id*. This determination is a question of fact for the ALJ, subject to the substantial evidence standard of review. *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988).

Because the application of this standard often requires a credibility assessment, the ALJ's reasons for discrediting the claimant's testimony must be premised on substantial evidence and be sufficiently explicit. *See e.g., Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992); *Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  The determination of credibility is reserved solely for the Commissioner and is not a proper function for the courts. *Daniels v. Apfel*, 92 F. Supp. 2d 1269, 1280 (S.D. Ala. 2000) (citing *Grant v. Richardson*, 445 F.2d (5th Cir. 1971)).[1] When the Commissioner states a clear finding of credibility, it should not be disturbed unless it is not supported by substantial evidence. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

In applying the pain standard, the ALJ must explicitly articulate his or her reasons for rejecting the plaintiff's subjective complaints of pain; if the ALJ fails to properly articulate his or her reasons for discrediting the plaintiff's subjective complaints of pain, the court must accept the testimony as true. *Hale v. Bowen*, 831 F.3d 1007, 1012 (11th Cir. 1987). Furthermore, the ALJ cannot reject a claimant's testimony based solely on his or her own observations or on criteria that are unsubstantiated by objective medical evidence. *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987).

The Eleventh Circuit does not require the ALJ to use formulaic language or phrases, or

---

[1] *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), *en banc*, adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

4

cite to specific case law. *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n. 5 (11th Cir.1986)). The court still "must be able to determine what statutory and regulatory requirements the ALJ did in fact apply." *Id* (*citing Parker v. Bowen*, 788 F.2d 1512, 1521 (11th Cir.1986) (*en banc*); *Owens v. Heckler*, 748 F.2d 1511, 1514–16 (11th Cir.1984).).

In the Eleventh Circuit, the ALJ must accord "substantial weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of the claimant's treating physician *unless* good cause exists for not doing so. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  A treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory. *See Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).The required good cause may exist where the opinion is not supported by the evidence, or where the evidence supports a contrary finding. *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). An ALJ's failure to specify the weight given to the treating physician's opinion or to explicitly discount the treating physician's opinion is reversible error. *Broughton*, 776 F.2d at 961-62.

### V. FACTS

The claimant was 49 years old at the time of the January 6, 2011 administrative hearing; and has a high school education and two years of vocational school. (R. 71-74). His past work experience includes employment as a grinder machinist, a rafter/trust assembler, and floor layer worker. (R. 94). The claimant alleged that pain from his back, right leg, and feet caused him to quit his job in March 2008 and has prevented him from returning to work. (R. 49-50). The claimant does not allege a specific event or precise date for the onset of his pain symptoms, but

claims to have reached a level of pain too severe to continue working on or around March 1, 2008. (R. 49).

*Physical Limitations*

Dr. Mitchell Massey, a treating physician at Tupelo Orthopedic Clinic, began seeing the claimant regarding pain in his feet in 1999. Dr. Massey diagnosed the claimant with plantar fasciatis and performed a release of the plantar fascia of the right foot with a heel spur excision on November 26, 1999. Dr. Massey's records indicate several follow-up visits, noting that the claimant had returned to work by February 17, 2000. The claimant reported working fifty hours per week to Dr. Massey on March 28, 2000, with some foot pain. The claimant had his medical records transferred to Dr. Keith Morrow, a treating physician at Morrow Clinics, Inc. in Hackleburg, Alabama, in August 2000. (R. 279-281).

On August 9, 2000, Dr. Morrow examined the claimant, who was complaining of post-surgery foot pain while standing.[2] The claimant returned to Dr. Morrow on September 29, 2000, complaining of depression and foot pain. Dr. Morrow prescribed him Vioxx and Robaxin for pain and inflamation, Celexa for depression, and Diovan for high blood pressure. (R. 374-76). Dr. Morrow's records indicate the claimant returned on December 18, 2000, for "personal" reasons. Dr. Morrow prescribed Lebrium for anxiety. (R. 373). The claimant complained of a rash on his legs on December 2, 2002, and Dr. Morrow prescribed Keflex and a Medrol Dosepak. The rash continued into a visit on January 13, 2003, where Dr. Morrow issued another prescription for Keflex. Dr. Morrow prescribed an additional Medrol Dosepak on January 31,

---

[2] Normally, the court would note the diagnosis and prescription for each medical visit. Dr. Morris's records are extremely vague in some instances and often illegible when handwritten. The court omits these illegible items for this reason where necessary.

2003. (R. 364-68).

On February 25, 2003, Dr. Morrow examined the claimant, who was complaining of impotency, anxiety, and insomnia. The claimant reported taking Methadone. Dr. Morrow prescribed Wellbutrin for anxiety and depression, Ambien for insomnia, and Viagra for impotence. He renewed the prescriptions on June 12, 2003.  Dr. Morrow again examined the claimant on April 25, 2003, due to raised blood pressure. Dr. Morrow administered an EKG test and prescribed Diovan. The claimant returned to Dr. Morrow on May 27, 2003, for a follow-up visit to review his blood pressure. Dr. Morrow administered another EKG. The claimant visited Dr. Morrow on September 15, 2003, complaining of insomnia. Dr. Morrow renewed the claimant's prescriptions for Wellbutrin, Ambien, and Diovan. These prescriptions were renewed again after a visit on December 9, 2003. The Wellbutrin and Diovan prescriptions were renewed additionally on March 9, 2004. The Ambian prescription was subsequently renewed after a visit on April 5, 2004, where Dr. Morrow also recommended increasing the claimant's Wellbutrin dosage. (R. 351-63).

On August 16, 2004, Dr. Morrow examined the claimant, who was complaining of head congestion, high temperature, and body pain. Dr. Morrow prescribed Clarinex, Amoxil, a Medrol Dosepak, and Albuterol for the cold symptoms. He also prescribed Sinequan for depression. Dr. Morrow provided the claimant with a work excuse for August 16, 2004. (R. 346-49). The records indicate Dr. Morrow renewed the claimant's prescription for Wellbutrin on October 19, 2004. On December 22, 2004, Dr. Morrow's records indicate a "Phone In Request" for an antibiotic and cough syrup based on the claimant's complaints of "coughing, stopped up, little temp, feels terrible." (R. 344). Dr. Morrow prescribed Amoxil and Histex. Dr. Morrow renewed the

7

Wellbutrin prescription on July 18, 2005. (R. 342-43). The claimant phoned in another request based on cold symptoms on January 4, 2006. (R. 311). Dr. Morrow complied with this request by prescribing a Z-Pack and Norel DM. (R. 340). The claimant again complained of cold symptoms to Dr. Morrow on March 21, 2006, and received prescriptions for Norel DM and Cleocin. (R. 339, 308). Dr. Morrow renewed the Wellbutrin prescription on April 1, 2006.

On July 26, 2006, Dr. Morrow examined the claimant, who was complaining of pain on the top of his right foot. The x-ray did not provide any conclusive results, and Dr. Morrow prescribed a Medrol Dosepak and Toradol for the pain. Additionally, Dr. Morrow provided the claimant with a work excuse for July 26th and 27th, clearing a return to work on July 28, 2006. Dr. Morrow filled another phone in request from the claimant on November 30, 2006. The claimant complained of a cold, with cough, congestion, and drainage. Dr. Morrow prescribed Norel DM and Cleocin. (R. 301-6).

On October 2, 2007, Dr. Morrow examined the claimant's back. The claimant complained of lower back pain; the records note the claimant "tried to pick up [illegible] that was stuck." (R. 300). Dr. Morrow ordered an x-ray and noted a mild abnormality in the discs L3 and L4. (R. 383). Dr. Morrow prescribed Naproxen for the pain.[3] Dr. Morrow issued the claimant a work excuse, clearing him to return to work on October 4, 2007. Dr. Morrow also renewed the claimant's Diovan prescription on October 3, 2007. (R. 291-300).

On March 19, 2008, Dr. Morrow examined the claimant, who complained of weakness and muscle aches after neglecting to take his blood pressure medication for four to five months.

---

[3] Another drug was prescribed as well. However, the records are illegible, and the court is unable to determine the drug's identity.

Dr. Morrow administered bloodwork tests and an EKG. Dr. Morrow provided the claimant with

a work excuse, clearing him to return to work on March 21, 2008. (R. 291-296). The claimant

phoned in a request to Dr. Morrow's office on March 24, 2008, informing the doctor of a home

blood pressure measurement of 203/189 and wanting to know the results of his bloodwork. (R.

382).

The claimant returned to Dr. Morrow on June 4, 2008, complaining of back and knee pain

causing him to quit his job. The record does not indicate any tests or diagnosis related to this

complaint, though Dr. Morrow did examine the claimant. (R. 292).

On August 13, 2008, Dr. George A. Evans, M.D., consulting physician, examined the

claimant for a medical disability exam. Dr. Evans found a reduced range of motion in the

claimant's hips and spine, tenderness in the feet consistent with plantar fascitis, difficulty

returning to a standing position from squatting, a slight edema in the feet, and inability to heel-to-

toe walk. However, the claimant had a normal range of motion indicated for the upper

extremities and ankles, ability for fine and gross hand manipulation, unassisted walking, normal

muscle strength, and normal reflexes. Dr. Evans diagnosed the claimant with lumbago, pain in

multiple joints, COPD, edema, hypertension, and shortness of breath on exertion. (R. 314-315).

On September 24, 2008, Dr. Brian Thomas, consulting psychologist, examined the

claimant. Although Dr. Thomas noted the claimant's self-reported history with drug abuse and

past prescriptions to Wellbutrin, he declined to diagnose the claimant with a mental disorder or

disease.  Dr. Thomas observed that the claimant was appropriately dressed and groomed; had a

neutral mood; denied problems with depression and anxiety; and had adequate immediate, recent,

and remote memory. Dr. Thomas further observed that the claimant's "pain may interfere with

his functioning, but this does not appear to be related to a psychological disorder." (R. 317).
Rather, the claimant possessed unaffected "ability to perform routine repetitive tasks, interact
with coworkers and receive supervision, and handle funds." *Id*.

On August 1, 2008, Dr. Muhammed Ali, MD, a treating physician sought out by the
claimant, examined the claimant. Dr. Ali noted that the claimant evaluated his own back pain at a
level nine and leg pain at a level eight, both on a scale of one to ten. The claimant reported to be
taking Diovan for blood pressure and Methadone for pain. Dr. Ali diagnosed the claimant with
degeneration of lumbar or lubosacral intervertebral disc and paraesthesia numbness. He
suggested the claimant discontinue over the counter medication and prescribed Gabapentin and
Methadone. Dr. Ali's notes state that "Dr. Camp has been writing Methadone." (R. 480). The
record is bare as to the identity and function of "Dr. Camp." The claimant returned to Dr. Ali on
August 21, 2008, again presenting with lower back pain. During this visit, the claimant evaluated
his back pain to be at a level of six and leg pain at a level of eight. Dr. Ali performed electrical
muscle stimulation therapy on the claimant's back. The claimant returned to Dr. Ali for a follow-
up visit on October 3, 2008, rating his back pain at a level of seven. (R. 480-486).

Another follow-up visit occurred on October 21, 2008. Dr. Ali noted the claimant did not
have x-rays completed for his office as requested. The claimant complained of lower back pain
and acute neck pain. Dr. Ali performed manipulation therapy on the claimant's neck and
electrical muscle stimulation to the lumbar region. The claimant returned to Dr. Ali on November
4, 2008, reporting complete improvement in his neck pain and back pain at a level of five. Dr.
Ali again performed manipulation therapy on the claimant's neck and electrical muscle
stimulation to the lumbar region. (R. 488-490).

10

Dr. Morrow examined the claimant again on December 16, 2008, for back, leg, and neck pain. The examination record indicates that the claimant complained of pain while washing dishes, doing laundry, or prolonged sitting or standing. Dr. Morrow renewed the prescription for Diovan during this visit. The claimant returned to Dr. Morrow for back pain on February 2, 2009. While the record indicates an examination, no information on a diagnosis or treatment exists in the record. (R. 431-434).

On March 4, 2009, the claimant visited Dr. Ali again, complaining of back pain at a level of six out of ten. Dr. Ali examined the claimant, finding degeneration of lumbar or lumbosacral invertebral disc and paraesthesia numbness. He continued the prescriptions of Methadone and Gabapentin. (R. 492).

After receiving notice from the claimant's attorney regarding the claimant's impending social security claim, Dr. Morrow examined the claimant again on April 24, 2009 for back and foot pain, noting that the claimant was not able to return to work. (R. 430). On the claimant's attorney's request, Dr. Morrow examined the claimant on May 12, 2009,  for purposes of filling out forms provided to him by the attorney. (R. 423-426; See Ex. 15F). Dr. Morrow's official diagnosis of the claimant on this form was back pain, bilateral foot and ankle pain, and COPD. Dr. Morrow cited his clinical findings as "palpable lumbar spine pain and spasm, palpable foot/ankle pain bilaterally, SLR [and] crossed leg bilaterally."  (R. 423). The attorney-provided form asked Dr. Morrow his opinion regarding "[w]hether or not the medical impairment from which the claimant suffers could reasonably be expected to produce disabling pain." Dr. Morrow answered in the affirmative. The form also asked Dr. Morrow to assess "[i]f the claimant is suffering from disabling pain, please characterize the pain, i.e. slight, moderate, moderately

11

severe or severe." Dr. Morrow chose "moderately severe." Dr. Morrow also expressed the

opinion that the claimant could only work one to two hours per day and should never lift more

than ten pounds due to his pain. (R. 424-26). Dr. Morrow also expressed the claimant's need to

avoid exposure to fumes, dusts, and gases due to his COPD. (R. 426).

On June 15, 2009, Dr. Stephen G. Sanders, consulting examiner for the SSA, examined

the claimant. Dr. Sanders found mild disc dislocation with disc bulging at L3-L4, as well as disc

bugling with minimal annular rent but no disc extrusion on L5-S1. (R. 459).

On July 13, 2009, Dr. Ali examined the claimant, who had returned complaining of back

pain. Dr. Ali increased the dosage of the claimant's Gabapentin prescription. The claimant

returned to Dr. Ali on August 12, 2009, complaining of back, neck, and shoulder pain. Dr. Ali

examined the claimant, performing electrical muscle stimulation therapy on the claimant's

lumbar, left extremity, and right extremity regions. (R. 493-94).

On August 27, 2009, Dr. Ali examined the claimant, who was complaining of back, neck,

and shoulder pain. The claimant reported to have been "cutting grass yesterday" and "hit a hole."

Dr. Ali performed electrical muscle stimulation therapy. (R. 496).

The claimant visited Dr. Ali on October 19, 2009, asking for sleep medication. Dr. Ali

prescribed Ambien. The claimant returned on March 26, 2010, asking for an increase in Ambien

for sleep. The claimant rated his back pain at a level of eight, with medication, and ten without

medication. Dr. Ali increased the Ambian dosage for insomnia. Dr. Ali examined the claimant

again on April 23, 2010. The claimant forgot to bring MRI results to Dr. Ali as requested. An x-

ray taken during this visit showed degenerative change at L5, with lipping noted at multiple

levels. The claimant returned to Dr. Ali for a follow-up on July 23, 2010. Dr. Ali noted that the

claimant denied using "BZD," also known as benzodiazepine, when asked. (R. 498-504).

On July 26, 2010, Dr. Eston G. Norwood, a neurological consultant for the SSA, examined the claimant. Dr. Norwood found good range of motion in the neck, spine, and limbs, as well as normal strength in the arms and legs. Dr. Norwood did note that claimant had an antalgic gait and that the claimant refused to walk on his heels due to pain. (R. 461). Dr. Norwood assessed the claimant as capable of lifting and carrying up to ten pounds frequently and up to fifty pound occasionally. Dr. Norwood opined that the claimant could sit for thirty minute periods for up to 6 hours in a workday; stand for ten minute periods up to one hour in a workday; and walk for ten minute periods for up to one hour in a workday. Despite the claimant's report of using a cane, though he did not have it with him the day of the exam, Dr. Norwood found the claimant would not require the use of a cane to ambulate. Dr. Norwood did not find any limitations in the claimant's use of his hands. (R. 464-65).

### First ALJ Hearing - March 2010

After the Commissioner denied the claimant's request for disability insurance benefits, the claimant requested and received a hearing before an ALJ. (R. 20). At the hearing, the claimant testified to experiencing pain in his back, legs, and feet to the extent of preventing him from doing his previous flooring job. (R. 50). He testified that the pain on an average day reached a level of seven on a scale of one to ten. He also testified that the pain increased to a level of ten on days "when the weather comes through." (R. 54).

The claimant testified that he participated in physical therapy and received pain medication and "shots" from Dr. Ali to manage his pain. (R. 53). Though the medical records from Dr. Ali were not available at the time of the ALJ hearing, the claimant, pursuant to the

ALJ's request, submitted the records subsequently. He stated that the therapy did not help. He claimed that the shots would help temporarily, but that the pain would return. The claimant testified that, to his knowledge, he was only able to get the series of shots once per year. The claimant attested to taking Diovan for blood pressure and Neurontin and Methadone for pain. He admitted to being addicted to narcotics in the past, after his divorce in 2000. The claimant also acknowledged smoking cigarettes in the past but claims to have quit a year prior to the hearing. (R. 56-58).

The claimant testified that he can sit for "a couple of hours" before having to stand from pain. He also stated that he could stand for ten minutes at a time. The claimant admitted that he would probably be able to do jobs such as a parking lot attendant or a store security guard if he were allowed to sit and stand whenever he needed. (R. 58).

A vocational expert, Dr. William Green, testified concerning the type and availability of jobs that the claimant was able to perform. (R. 59-65). He stated that the claimant's supervisory skills may be transferable to lighter work. The ALJ created a hypothetical individual with the age, education, and prior history and training of the claimant, and presented Dr. Green with three situations, all differing in the levels of physical limitations. (R. 60-62).

The first hypothetical individual's limitations included: occasionally lifting and carrying up to twenty pounds; frequently carrying up to ten pounds; standing or walking with normal breaks for up to six hours in an eight hour shift; frequently climbing ramps and stairs; balancing, stooping, kneeling, and crouching; and avoiding concentrated exposure to extreme cold, fumes, odors, dust, gases, and poor ventilation. Dr. Green replied that the suggested individual would not be able to return to the claimant's former jobs. However, Dr. Green testified that such an

14

individual could do light and unskilled sales clerk jobs and some security guard jobs that are located indoors. (R. 60-61).

The ALJ's second hypothetical to the vocational expert included an individual with the same limitations as the first, except he could occasionally lift or carry up to fifty pounds and frequently lift or carry up to twenty-five pounds. Dr. Green stated that this individual would be able to return to the claimant's jobs. (R. 62-63).

The third hypothetical individual can occasionally lift or carry up to twenty pounds and frequently lift or carry up to ten pounds. This individual could sit for two hour periods across an eight hour shift and could stand for ten minutes at a time during the same shift. Dr. Green testified that the individual would not be able to do any of the claimant's former jobs, but could be a general office clerk, dispatcher, or receptionist. (R. 63). Dr. Green acknowledged that a pain level of seven or greater on a scale of one to ten would preclude full time employment. (R. 65).

*Second ALJ Hearing - January 2011*

After the conclusion of the March 2010 hearing, the ALJ scheduled an additional hearing to hear testimony from a medical expert, Dr. Allan Levine, regarding the claimant's condition. (R. 69). The claimant testified at this hearing to having back pain that radiates down his right leg after standing, neck pain that radiates into his shoulder, and foot pain. The claimant testified to being able to sit for fifteen to thirty minutes at a time and stand for ten to fifteen minutes at a time. The claimant testified to having to lie down frequently because of the pain. (R. 72-73). The claimant stated that his feet were swollen constantly and that he had to prop them up several times during the day to address the swelling. The claimant reported his pain level to be at a six or a seven with medication, but worse with increased activity. (R. 77-78).

Dr. Allan Levine, a consulting medical expert, testified at the second hearing. Dr. Levine stated that the medical records did not support the claimant's testimony regarding the severe swelling that the claimant described. Dr. Levine also noted the claimant's ability to walk around the grocery store despite the claimant's self-reported inability to stand for more than ten minutes or walk more than thirty to forty yards. Dr. Levine asked the claimant about the medical record from his visit to Dr. Ali in August of 2009 indicating that the claimant hurt his back after cutting grass. The claimant denied knowledge of the event. (R. 80-85).

Dr. Levine testified that he believed the claimant did have a medically determinable impairment of chronic back pain, secondary to mild degenerative disc disease, and mild bulging discs. He also determined the claimant to have an impairment of chronic bilateral foot pain secondary to Plantar Fasciitis and possible tendinitis. Dr. Levine noted a lack of evidence in the medical records regarding reports of pain following the claimant's surgeries in 1999. (R. 85-87). Specifically, he noted an x-ray from the Morrow Clinic where Dr. Morrow diagnosed the claimant with "calcific tendinitis." Dr. Levine disagreed with the diagnosis, stating that x-ray technology cannot be used to diagnose tendinitis. He stated that the claimant's foot problems did not meet a listing within the Social Security framework, noting the claimant's ability to walk around the grocery store and the lack of x-rays or imaging to show a severe problem. Dr. Levine did not find evidence of any nerve ending or spinal cord compromise within the EMG and nerve conduction study results or on the claimant's MRI. (R. 87-88). Dr. Levine did not agree that the objective MRI showing only mild degenerative disc disease with mild bulging would suggest the severity of pain and physical limitations that the claimant contended.  (R. 91).

Dr. Levine issued an opinion on the RFC, as provided by Dr. Norwood. Dr. Levine

believed that Dr. Norwood relied on the claimant's subjective reports of pain to place limitations

on standing and walking. Additionally, Dr. Levine found the RFC limitations to walk or stand for

one out of eight hours, and for less than ten minutes at one time, to be contradictory to the RFC's

findings that the claimant could continuously use stairs, heavy machinery or unprotected heights.

In Dr. Levine's opinion, he believed the claimant should be able to lift up to twenty pounds

occasionally, lift ten pounds frequently, sit six out of eight hours with customary breaks, and

walk two out of eight hours for twenty minutes at a time.  Dr. Levine suggested that the claimant

should avoid ladders, crawling, heavy machinery, unprotected heights, extreme cold exposure,

and repetitive stooping. However, Dr. Levine stated the claimant should have unlimited use of

his upper extremities. (R.88- 89).

 Mr. Thomas Elliot also testified at the second ALJ hearing in his capacity as a vocational

expert.  Mr. Elliot testified to the claimant's past relevant work as a grinder machinist, a floor

layer, and in rafter/trust assembly. Mr. Elliot stated these past positions were semiskilled medium

exertion levels. He found the skills from these jobs were not transferable to any occupations at a

light or sedentary exertional level. Mr. Elliot testified that the limitations assessment provided by

Dr. Levine would preclude all past work. However, Mr. Elliot noted the existence of other

occupations appropriate for someone of the claimant's limitations and skill level, consistent with

the Dictionary of Occupational Titles, including a hardware assembler, and inspector/hand

packager, and a packing line worker. He stated that these positions exist at a sufficient number

both regionally and within the national economy. (R. 93-96).

 Mr. Elliot testified further that limiting the claimant to no more than one hour standing or

walking within a work day would preclude light exertional level jobs. He noted that unskilled

17

sedentary work would be possible with these additional limitations. Mr. Elliot stated that pain at a level seven out of ten, or distraction or drowsiness cause by medication side effects, would preclude the ability to sustain attention, concentration, or pace in a job task and would preclude gainful employment. (R. 97-98).

*The ALJ's Decision*

On March 1, 2011, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act.  Next, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset date. Then, the ALJ found the claimant to be suffering from severe impairments, including mild chronic obstructive pulmonary disease (COPD), hypertension, arthritis, and obesity. (R. 20-22). After reviewing the record regarding anxiety and depression, as well as Dr. Brian Thomas's evaluation, the ALJ found that the claimant did not have a medically determinable mental impairment. Despite the existence of certain severe impairments, the ALJ concluded that these impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments.  (R. 23-24).

The ALJ next considered the claimant's subjective allegations of pain to determine whether he had the residual functional capacity to perform past relevant work. The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." To support his conclusion, the ALJ referenced the examination of Dr. Sanders. The ALJ found that Dr. Sanders's description of the

MRI as "showing minor changes of disc bulging with minimal annular rent at L4-L5 and L5-S1" inconsistent with the claimant's reported severity of pain, as well as the claimant's own testimony of driving 15 to 20 miles to his mother's house and grocery shopping for small items. Additionally, the ALJ referenced the claimant's own testimony to working 50 hours per week shortly after having surgery on his feet. The ALJ also noted the evaluation of consultive examiner Dr. Evans, who found normal range of motion in the claimant's shoulders, elbows, and forearms, normal bilateral hand crip, ability to perform fine and gross manipulation, normal ankle range of motion, no deformities in the spine, unassisted gait, ability to squat, normal reflexes, and a negative Romberg test. The ALJ placed great weight upon the opinion of Dr. Levine, the medical expert, to determine the proper RFC. The ALJ rejected the opinions of Davis's treating physician, Dr. Morrow, finding the opinions inconsistent with the totality of the record, including objective medical evidence. Dr. Morrow's assessment that the claimaint could only work one to two hours per day and never lift more than ten pounds is a significant departure from the opinions of Dr. Sanders, Dr. Evans, and Dr. Levine, as well as the claimant's self-reported activities of daily driving, grocery shopping, and yardwork. (R. 24-27).

The ALJ concluded that the claimant had the RFC to perform light work, including "lifting and carrying up to twenty pounds occasionally and up to ten pounds frequently and sitting for up to six hours during an eight-hour workday with customary breaks." (R. 24). The ALJ also noted that the claimant could, within an eight-hour workday, stand for four hours with normal breaks and walk for two hours though not more than twenty minutes at a time. The ALJ did conclude that the claimant should avoid "crawling, climbing ladders, unprotected heights, dangerous machinery, extreme cold, and concentrated exposures to fumes, odors, dusts, gasses,

19

and poor ventilation." *Id.* The ALJ concluded that the claimant is unable to perform any of his past relevant work, because those jobs involved medium exertion levels. Relying on the Medical Vocational Guidelines and the testimony of the vocational expert, the ALJ found that the claimant is capable of performing a significant number of jobs that exist in the national economy and, therefore, is not disabled under the Social Security Act. (R. 27-28).

## VI. DISCUSSION

The claimant did not file a brief in this matter. The Eleventh Circuit has not addressed whether a social security disability claimant must file a brief with his original complaint in the district court, nor has the Eleventh Circuit determined the specific consequences of a claimant's failure to file a brief with the district court. The federal district courts differ in their approach to complaints unaccompanied by briefs. The Southern District of Georgia has held the failure to file a brief in a social security case to be a complete waiver of claims. *See Walton v. Astrue*, 2010 U.S. Dist. LEXIS 11515, *5 n.3 (S.D. Ga. 2010). The District of South Carolina has dismissed complaints unaccompanied by briefs for failure to prosecute. *See Messer v. Comm'r of Soc. Sec*, 2011 U.S. Dist. LEXIS 152525 (D. S.C. 2011); *but see Shaw v. Comm'r of Soc. Sec.*, 1998 U.S. Dist. LEXIS 18414, *5 (N.D.N.Y. 1998) (holding that dismissing a claimant's complaint for not filing a brief too harsh).

However, the majority of districts, including the Northern District of Alabama, review the record to determine whether the ALJ properly applied legal standards and supported his factual conclusions with substantial evidence, despite the claimant's failure to file a brief. *See, e.g., Mitchell v. Apfel*, 1999 U.S. Dist. LEXIS 17549 (N.D. Ala. 1999); *see also Beckstrom v. Astrue*, 2011 U.S. Dist. LEXIS 38224, *6 (D. Az. 2011) (finding the filing of briefs unnecessary in social

security disability complaints). Moreover, the notice to parties issued by the Clerk of this court upon receipt of social security disability benefits pleadings states that the court does not require briefs.

Having determined that the claimant's failure to file a brief does not restrict review, this court will review the record to determine whether the ALJ properly applied legal standards and supported his factual findings with substantial evidence. For the reasons stated below, this court affirms the ALJ's decision and finds that the ALJ properly applied legal standards and supported his conclusions with substantial evidence.

*Subjective Reports of Pain*

The first issue which the court addresses is whether the ALJ properly applied the three-part pain standard set forth by the Eleventh Circuit. This court finds that the ALJ properly applied the standard, with substantial evidence to support his decision.

The court applies the three-part pain standard when a claimant attempts to establish the existence of a disability via his or her own testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Cir. 1991). The standard requires "(1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id* (emphasis added). If a claimant's subjective testimony is supported by medical evidence that satisfies the pain standard, it is sufficient to support a finding of a disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). If the ALJ decides not to give credence to the claimant's subjective testimony of pain, he must be explicit in his articulation of his reasons. *Brown v.*

21

*Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).

In this case, the ALJ concluded that the objective medical evidence supported the existence of an underlying medical condition, including mild COPD, hypertension, arthritis, and obesity. The ALJ recognized that the claimant's medically determinable impairments could be reasonably expected to cause the symptoms that he alleges. The claimant argued his impairments caused problems with squatting and kneeling, precluding him from doing basic activities like washing dishes or doing laundry. However, the ALJ found that the objective medical evidence did not support the severity, specifically the "intensity, persistence and limiting effects," of the symptoms as claimed. (R. 25). The ALJ noted that the evidence in the record did not support impairments at the severity that would preclude activity within the RFC assessment. (R. 22-25).

The ALJ relied on Dr. Sander's description of the anomalies in the claimant's MRI of his spine as "minor" and "minimal." (R. 25, 459). The claimant's own statements contradict his testimony of severe pain. For example, while the claimant complained of recurring foot pain approximately four months after the November 26, 1999 plantar faciatis surgery, he also reported working 50 hours per week during this time. (R. 279). Additionally, he reported back, neck, and shoulder pain on August 27, 2009, but reported this pain to stem from hitting a hole while cutting grass on the previous day. (R. 496). Consultive examiner Dr. Evans documented physical symptoms, including a reduced range of motion in the claimant's hips and spine, some foot tenderness consistent with plantar fasciitis, and difficulty returning from a squatting position. The ALJ noted Dr. Evans also found the claimant to possess normal ranges of strength and motion in his upper body, normal ranges of strength in his lower body, an unassisted gait within normal limits, the ability to get into a squatting position completely, and reflexes within normal limits.

22

(R. 25, 315). The ALJ found that the examination and report of Dr. Norwood also conflicted, in part, with the claimant's reports of severe limitations. (R. 26). Dr. Norwood found good range of motion and normal strength in the claimant's neck, spine, and limbs. (R. 26, 462).

The ALJ additionally rejected the claimant's contention that his hypertension and COPD were severely limiting. The ALJ noted that the claimant's blood pressure was measured at 159/100 by Dr. Evans, but the claimant reported neglecting to take his blood pressure medicine for two days prior to the reading. (R. 26, 394). The ALJ evaluated the records from the pulmonary function tests pursuant to Medical Listing 3.02 and found the claimant's results to fall far below the severity required. (R. 24, 323-325).

The ALJ based the finding of no mental impairment on the examination by the consulting psychologist, Dr. Thomas, as well as the claimant's own testimony. Dr. Thomas did not find the claimant to be suffering from any mental disorder. The ALJ noted that, while the claimant reported to have abused drugs and has taken antidepressants in the past, he reported to be clean and off of any psychotropic medications on the date of Dr. Thomas's evaluation. (R. 25-26, 317-318).

The ALJ's explicit findings indicate that the ALJ gave sufficient reasoning and relied upon correct legal standards in refusing to give credit to the claimant's subjective complaints of pain and physical limitations. The ALJ's findings provide the court with the requisite level of specificity to withstand any allegations of error. (R. 22-28). A credibility determination is a function solely within the control of the Commissioner and not the courts. *Daniels*, 92 F. Supp. 2d at 1280. Consequently, the court will not disturb a clearly stated credibility finding unless it is not supported by substantial evidence. *MacGregor*, 786 F.2d at 1053. Because the ALJ's

assessment of the claimant's credibility is clearly articulated and corroborated by objective

medical evidence, the court concludes that substantial evidence exists to support the ALJ's

conclusion that the claimant's testimony of disabling pain and severe physical limitations are not

supported by the objective medical evidence.

*Weight Given to Physician Testimony*

The court also considers whether the ALJ provided the proper weight to the testimony of

his treating physician, Keith Morrow, D.O. This court finds that the ALJ established the 'good

cause' required by the Eleventh Circuit to limit the weight placed on a treating physician's

testimony.

Eleventh Circuit precedent requires the ALJ to give "substantial weight" or "considerable

weight" to the opinion, diagnosis, and medical evidence of the claimant's treating physician.

*Lewis*, 125 F.3d at 1440.  However, the ALJ may establish 'good cause' to eschew the treating

physician's report when it is not accompanied by objective medical evidence or is wholly

conclusory. *Edwards*, 937 F.2d at 583. Good cause may exist where the opinion is not supported

by the evidence, or where the evidence supports a contrary finding. *Schnorr,* 816 F.2d at 582.

Failure of the ALJ to indicate the amount of weight given to the treating physician's testimony or

to explicitly discount the opinion is reversible error. *Broughton*, 776 F.2d at 961-62.

The ALJ noted in particular that Dr. Morrow made conclusory statements regarding

whether the claimant is disabled from his symptoms. (R. 424). As the ALJ stated, this

determination is a function reserved solely for the Commissioner and court review, not a treating

physician. The ALJ noted that Dr. Morrow's assessments of the claimant's pain and limitations

were in significant excess of the testimony of Drs. Sanders and Evans as well as the objective

24

medical evidence. Dr. Morrow's assessment of the claimant's foot pain and medication side effects were also elevated when compared to the totality of the record. (R. 27).

The ALJ also limited the weight given to the opinion of the consultative examiner Dr. Norwood. The ALJ noted that Dr. Norwood's assessment in particular was based on the claimant's subjective report of back pain. (R. 27, Exhibit 18F). Because of the ALJ's factual finding that the claimant's subjective testimony was not credible, any assessment utilizing these subjective reports therefore is not credible. Additionally, the ALJ limited the weight given to the state agency consultants' physical assessments. (R. 27, Exhibits 8F and 12F). Opposite to Dr. Morrow's assessment, the ALJ found these assessments not restrictive enough considering the limitations and credible symptoms that are effectively established by the record. (R. 27).

The ALJ properly gave substantial weight to the state agency medical consultants findings, excepting Dr. Norwood's assessment, that the claimant was capable of light work because such a conclusion was supported by the objective medical evidence contained in the record as a whole. The impartial medical expert, Dr. Levine, to which the ALJ gave great weight, found that the claimant is capable of light work. The ALJ concluded Dr. Levine's opinion was consistent with the objective medical evidence and opinions of the state agency consultants. (R. 26-27).

Because the ALJ's opinion specifies the amount of weight given to each physician, including the claimant's treating physician, and establishes good cause through comparing the opinion testimonies to the objective medical evidence and totality of the record, this court finds the ALJ accorded proper weight to the claimant's treating physician as required by the Eleventh Circuit.

**VII. CONCLUSION**

Accordingly, the ALJ's disability determination is supported by substantial evidence and the decision of the Commissioner is AFFIRMED.

DONE and ORDERED this 25th day of February 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE